OPINION
{¶ 1} Defendant-appellant Kyle Carver appeals from his conviction and sentence for Unauthorized Use of a Vehicle, Kidnapping, and Felonious Assault.
 {¶ 2} Carver first contends that the trial court erred when it allowed the prosecutor to comment, over objection, that the defendant presented no evidence to rebut the State's evidence. We conclude that this was not error when the State did not specifically comment *Page 2 
on Carver's failure to testify, and noted that Carver's exercise of his right not to testify should not be held against him.
 {¶ 3} Carver next contends that the trial court erred in its handling of the State's peremptory challenge to an African-American prospective alternate juror, under Batson v. Kentucky (1986), 476 U.S. 79. We conclude that where an alternate juror is excused before deliberations begin, any constitutional error in the handling of a peremptory challenge to that alternate juror cannot have affected the outcome of the trial, and is therefore necessarily harmless, so that no presumption of prejudice arises.
 {¶ 4} Carver next contends that the trial court erred by permitting the admission of evidence of his use of illegal drugs. We conclude that this evidence was used to explain Carver's alleged conduct having been seemingly inconsistent with evidence of his character in general. As used, this evidence had a probative value that outweighed its prejudicial nature, and the trial court did not err in admitting it.
 {¶ 5} Carver next contends that the trial court erred by using jury verdict forms that did not specify the degree of the felony of the offenses of Kidnapping and Unauthorized Use of a Vehicle. We conclude that the use of these forms was not error, because Carver was convicted of the least degree of those offenses as they were charged in the indictment.
 {¶ 6} Carver next contends that the trial court abused its discretion when it declared a mistrial with respect to certain counts of the indictment upon which the jurors were not able to agree. We conclude that the trial court did not abuse its discretion in this regard.
 {¶ 7} Carver next contends that the trial court erred by failing to include in the jury *Page 3 
verdict forms a specification of the necessary predicate for a finding by the trial court that the Kidnapping offense of which he was convicted was a sexually oriented offense. We conclude that where the charge contained in the indictment refers to the statutory provision containing the necessary predicate for a finding by the trial court that the offense is a sexually oriented offense, the verdict forms are not required to include that predicate, and there is no requirement that the jury make findings in that regard.
 {¶ 8} Carver next contends that his trial counsel was ineffective in certain respects. We conclude that the record does not support this contention. With respect to Carver's specific assertion that his trial counsel was ineffective for having failed to move to suppress evidence, the record reflects that his trial counsel advised him of the possibility of filing a motion of that nature, but that Carver expressed a preference to avoid any further delay and to go to trial.
 {¶ 9} Carver next contends that the trial court impermissibly sentenced him to maximum, consecutive sentences without adequate findings of fact by a jury. We conclude that Carver's failure to object at sentencing forfeited any claim along these lines. We also conclude that the application of State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, to this case does not, as Carver argues, violate the Ex Post Facto Clause.
 {¶ 10} Carver next contends that the cumulative effect of errors in his trial deprived him of a fair trial. We conclude otherwise.
 {¶ 11} Finally, Carver contends that his Kidnapping conviction must be reversed under the authority of State v. Colon, 118 Ohio St. 3d 26,2008-Ohio-1624, reconsidered, 2008-Ohio-3749, because of the lack of a specified mens rea. We conclude that the Kidnapping offense of which Carver was indicted, tried, and convicted, and upon which the jury was *Page 4 
jury was instructed, included a specific mens rea — the purpose to engage in sexual activity with the victim against her will.
 {¶ 12} For the reasons noted, the judgment of the trial court is Affirmed.
 I {¶ 13} In late August 2003, Carver and "M" were living together in M's apartment in Dayton. They had met in March or April of 2003 when both were working for a telecommunications company, and they began dating in early August. Carver was approximately forty years old, approximately fourteen years older than M.
 {¶ 14} On August 28, 2003, Carver picked up M from work, and they returned to the apartment. There, M discovered that her television was missing. Carver told her that he had pawned the television to get money. According to M, they argued and she later found a pawn ticket from Don's Pawn Shop in the car. At some point, Carver pulled out a crack pipe, lit it up, and had M watch him smoke it. Around 9:00 p.m., Carver left, saying that he was going to try to make some money to get her television back. Carver later returned with a cousin, J.R., and Carver and M "had a few more words." Carver grabbed M's car keys, which were for a Chevrolet Cavalier owned by M's mother, and he left. M stated she thought he had left at approximately 3:00 a.m.
 {¶ 15} At approximately 3:00 a.m. on August 29, 2003, "B," M's mother, was awakened by someone banging on the door to her apartment. B testified that she initially did not know who was at the door and she threatened to call the police if the person did not leave. However, she then heard the mail slot open and Carver's voice say, "Mom, it's Kyle, I need to talk to you about [M]." B let Carver into her apartment. *Page 5 
 {¶ 16} After entering, Carver got a glass of water and sat on the couch in the living room. Carver told B that "this isn't really about [M]" and he started to unbutton his shirt. B tried to stand and move away, but Carver grabbed her and pulled her back down to the couch. B testified that Carver put his hand on her throat and threatened to strangle her if she screamed or made noise. Carver continued to undress and told her that "he was going to give [her] what [she] wanted." Carver then led B to her bedroom, where he performed oral sex on her and had vaginal intercourse. Afterwards, Carver and B returned to the living room so Carver could smoke a cigarette; B also smoked a cigarette.
 {¶ 17} B testified that she thought Carver would leave at that point. Instead, after approximately twenty minutes, Carver took B back to her bedroom, where they had vaginal intercourse again. B stated that she tried to prevent Carver from turning her over for anal intercourse by putting her legs around him. Carver then put his fingers in her rectum. Carver and B returned to the living room for more cigarettes, and Carver began to pull his pants up. However, he apparently changed his mind and choked B until she was almost rendered unconscious. Afterward, Carver dragged B back to the bedroom and had vaginal intercourse for a third time.
 {¶ 18} Carver again went back to living room. There, Carver pulled out a crack pipe, lit it, and smoked it. Carver told B: "This is the reason I do stuff like this. I have a habit. This makes me * * * do the bad things." Carver then stated that he had to go home and tell M. Carver took B's cell phone and her keys to the Cavalier. Carver started to hand B her cell phone, but then stated, "I'll leave it out there on the dumpster and that'll give me some time." B testified that Carver left at approximately 6:00 a.m. B and M both testified that Carver did not have permission to use the vehicle. *Page 6 
 {¶ 19} After Carver left her apartment, B crawled to a neighbor's apartment, and the police were called. B was transported to Good Samaritan Hospital, where she gave a statement to a sheriff's deputy and a rape kit was completed, primarily by Julia Rismiller, a registered nurse. Photographs were taken of B's neck, which was red. Several witnesses testified that B's voice sounded raspy and hoarse in the hospital.
 {¶ 20} According to Mark Squibb of the Miami Valley Regional Crime Laboratory, spermatozoa and semen were found on the vaginal and anal swabs. After Carver provided a DNA sample in February 2005, Squibb identified Carver as the source of the semen on the vaginal swab. No DNA analysis was performed on the anal swab.
 {¶ 21} B's car was recovered in September 2003 in Greensboro, North Carolina, after it was involved in an accident. M testified that Carver had a son who lived in Greensboro. In 2005, Carver was ultimately arrested in Pennsylvania and returned to Ohio.
 {¶ 22} Carver did not present any evidence at trial. However, his counsel asserted during opening statements that Carver and B had engaged in consensual intercourse. Defense counsel's cross-examination also emphasized that B was taking several psychotropic medications at the time of the alleged sexual assault.
 {¶ 23} Carver was indicted on five counts of Rape and one count each of Gross Sexual Imposition, Kidnapping with a sexual motive, Felonious Assault, and Unauthorized Use of a Vehicle. Carver filed a motion to dismiss and a motion to suppress statements given to the police in February 2005. The court granted the motion to suppress and overruled the motion to dismiss. Following a jury trial, Carver was convicted of Felonious Assault, Kidnapping, and Unauthorized Use of a Motor Vehicle. He was acquitted of four counts of Rape, and the jury *Page 7 
counts of Rape, and the jury could not reach a verdict on one Rape count or on the Gross Sexual Imposition count. Carver was sentenced to maximum and consecutive sentences, for an aggregate term of nineteen years in prison. In his initial appeal, we held that the trial court did not err in denying Carver's motion to dismiss. State v. Carver, Montgomery App. No. 21328, 2006-Ohio-5798. We also rejected his argument that the Kidnapping conviction was inconsistent with the verdicts on the Rape charges, and we held that the convictions were neither based on insufficient evidence nor against the manifest weight of the evidence. Subsequently, Carver filed an application to reopen his appeal, which we granted, in part, on February 1, 2007. Carver now raises ten additional assignments of error.
 II {¶ 24} Carver's First Assignment of Error is as follows:
 {¶ 25} "THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO COMMENT ON MR. CARVER'S DECISION NOT TO TESTIFY AT TRIAL."
 {¶ 26} In his First Assignment of Error, Carver claims that the prosecutor commented on the fact that he did not testify at trial, in violation of his Fifth Amendment right to remain silent. As a corollary, Carver further argues that the trial court erred in failing to grant a mistrial on that basis.
 {¶ 27} The prosecutor began the State's rebuttal closing argument by stating:
 {¶ 28} "I wanna thank you for your kind attention over the last couple of days. I've noticed, uh . . . as all of us have, that all of you have been active in your listening to what all the State's witnesses had to say. *Page 8 
 {¶ 29} "And I wanna show you, if I can, one or two Exhibits — I'm looking for, uh . . . Ten and Eleven, and I don't see them.
 {¶ 30} "* * *
 {¶ 31} "In any event, the thing — one of the things you need to remember here about the evidence is, it's uncontroverted. The evidence in this case is uncontroverted. Now let's . . ."
 {¶ 32} At this juncture, defense counsel objected and asked to approach the bench. At sidebar, defense counsel requested a mistrial on the ground that the prosecutor's comments "invaded and denied [Carver's] right to remain silent." The trial court overruled the objection and the motion for a mistrial, reasoning that the State could not point out to the jury that Carver had not testified but that it could "discuss their evidence and whether there's anything controverted or not." The prosecutor then continued his rebuttal closing argument, saying:
 {¶ 33} "As I was saying, the evidence in this case is uncontroverted. You heard from the testimony of the witnesses. And every case, whether it's this unfortunate kind of case, or a car theft, whatever it is, you base it on the credibility of the witnesses, how they testify, their demeanor, their frankness of memory. All of those things that you use in the test of truthfulness in your own everyday lives.
 {¶ 34} "If you remember, I asked some of you [during voir dire] if you had kids. There was someone who had two eleven-year-olds, there was someone else that had other kids, there was someone else that managed people in their place of employment. And I asked you when other people, uh . . . told you stories or told you anything, how were you able to resolve those conflicts? And all of you said you do that in your everyday lives. And that's what you *Page 9 
that's what you do here. * * *"
 {¶ 35} On appeal, Carver asserts that the prosecutor's comments were, in essence, a comment on his silence at trial, because only Carver's testimony could controvert B's testimony. He further argues that the prosecutor's reference to his questioning during jury selection about resolving conflicts between children or employees emphasized that Carver had not told his side of the story. He also notes that the prosecutor had told the prospective jurors during jury selection that they could not consider that "we wanted to hear from the Defendant." The State responds that the prosecutor's comments were neither improper nor prejudicial. It notes that Carver failed to present any evidence and that others could have refuted the State's evidence.
 {¶ 36} Generally, prosecutors are entitled to considerable latitude in closing argument. State v. Ballew (1996), 76 Ohio St.3d 244, 255;State v. Adrian, 168 Ohio App.3d 300, 2006-Ohio-4143, ¶ 63. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v.Lott (1990), 51 Ohio St.3d 160, 165, quoting State v. Stephens (1970),24 Ohio St.2d 76, 82.
 {¶ 37} It is well-established that the State may not comment on a defendant's decision not to testify. State v. Collins,89 Ohio St.3d 524, 528, 2000-Ohio-231. However, the State may comment on the defendant's failure to offer evidence. Id. Whether a comment is proper depends on "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." State v.Cooper (1977), 52 Ohio St.2d 163, 173, quoting Knowles v.United States (C.A.10, 1955), 224 F.2d 168, 170. *Page 10 
 {¶ 38} "A prosecutor generally may note that his or her evidence is uncontradicted unless it is evidence only the defendant could contradict." State v. Webb, 70 Ohio St.3d 325, 329, 1994-Ohio-425. "A reference by the prosecutor in closing argument to uncontradicted evidence is not a comment on the accused's failure to testify, where the comment is directed to the strength of the state's evidence and not to the silence of the accused, and where the jury is instructed * * * to not consider the accused's failure to testify." State v. Williams (1986),23 Ohio St.3d 16, 19-20.
 {¶ 39} In support of his assertion that the prosecutor's statements could be viewed as an indirect reference to his refusal to testify, Carver relies on State v. Cox, Butler App. No. CA2003-05-113, 2004-Ohio-4977. In Cox, the prosecutor told the jury that the State's evidence that the defendant had engaged in fellatio and anal intercourse with the victim was uncontroverted. Because only Cox could contradict the victim's contention that this sexual activity had occurred, the appellate court acknowledged that the comment could be construed as an indirect reference to the defendant's decision not to testify. However, given the overwhelming nature of the evidence against the defendant, it found that the statement did not rise to the level of plain error.
 {¶ 40} Unlike in Cox, the prosecutor in this case made a general statement that the State's evidence was uncontroverted, and it did not closely tie its comment to specific conduct by Carver that only he could contradict. In other words, the prosecutor did not say that the evidence was "uncontroverted" in such a manner that the jury was led to believe that Carver was hiding something. Rather, the State's comment was directed to the fact that Carver did not present any witnesses or documentary evidence on any of the State's claims. In our *Page 11 
claims. In our view, the prosecutor's comments, in this case, constituted proper commentary on the fact that Carver had not presented any evidence at trial, and it did not implicate his right to remain silent.
 {¶ 41} Moreover, we agree with the State that the prosecutor's statement was harmless beyond a reasonable doubt. Through cross-examination, defense counsel effectively emphasized that the State's witnesses' testimony was subject to multiple interpretations and the "uncontroverted" evidence was not necessarily credible. The jury, in turn, acquitted Carver of four counts of Rape and it failed to reach a verdict on two other charges — Rape and Gross Sexual Imposition. Considering that Carver asserted that the intercourse was consensual, the Rape and Gross Sexual Imposition charges were the ones most dependent on the credibility of the parties to the intercourse. By acquitting Carver of Rape, the jury evidently did not take the victim's version of events at face value, nor did it hold Carver's failure to testify against him.
 {¶ 42} Finally, the trial court instructed the jury that it was not necessary for Carver to take the witness stand in his own defense, that he had a constitutional right not to testify, and that the fact that he did not testify must not be considered for any purpose. We presume that the jury followed the trial court's instructions. State v.Stallings, 89 Ohio St.3d 280, 286, 2000-Ohio-164. Moreover, the prosecutor's comments during voir dire did not undermine this instruction, but emphasized instead that Carver had a Fifth Amendment right not to testify and that his failure to testify could not influence the verdicts.
 {¶ 43} Because the prosecutor's comment was not directed to Carver's decision not to testify, the jury was instructed not to consider his failure to testify for any purpose, and the jury's verdicts do not suggest that Carver was prejudiced, Carver's First Assignment of Error *Page 12 
Error is overruled.
 III {¶ 44} Carver's Second Assignment of Error provides:
 {¶ 45} "THE TRIAL COURT ERRED WHEN IT FAILED TO SUSTAIN MR. CARVER'S BATSON CHALLENGE."
 {¶ 46} In his Second Assignment of Error, Carver claims that he was denied his right to equal protection, as guaranteed by the United States Constitution, when the State used a peremptory challenge to strike an African-American prospective alternate juror.
 {¶ 47} A state denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded. Batson v. Kentucky (1986), 476 U.S. 79. Therefore, "the Equal Protection clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Id. at 89. InBatson, the United States Supreme Court created a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated:
 {¶ 48} "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race."Batson, 476 U.S. at 82; see State v. White (1999), 85 Ohio St.3d 433,436. In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race. Batson, 476 U.S. at 95; State v. Williams, Franklin App. No. 03AP-24, 2003-Ohio-5761. The trial court must "consider all *Page 13 
"consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present."Batson, 476 U.S. at 96-97.
 {¶ 49} Second, once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge "related to the particular case to be tried." Id. at 98. Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 97. In fact, the prosecutor's explanation for striking the prospective juror is not required to be "persuasive, or even plausible." "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem (1995), 514 U.S. 765, quoting Hernandez v. New York (1991), 500 U.S. 352; see, also, State v. Gowdy, 88 Ohio St.3d 387, 392, 2000-Ohio-355.
 {¶ 50} Third, the trial court must determine "whether the defendant has carried his burden of proving purposeful discrimination."Batson, 476 U.S. at 82. In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a "pretext" for unconstitutional discrimination.Hernandez, 500 U.S. at 363; Brown, supra. Because this third stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference. Hicks v. Westinghouse MaterialsCo. (1997), 78 Ohio St.3d 95; Hernandez, 500 U.S. at 365; Miller-El v.Cockrell (2003), 537 U.S. 322, 339-40 ("Deference is *Page 14 
("Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations.").
 {¶ 51} In the present case, counsel questioned a pool of twenty-three individuals, which included Mr. Jones, an African-American. One prospective juror was dismissed for cause and another for illness. In chambers following voir dire, the State exercised two peremptory challenges against prospective jurors; Carver did not question the State's exercise of any of these peremptory challenges. Carver exercised three peremptory challenges against prospective jurors. After twelve jurors were selected, Carver and the State each had one peremptory challenge to use during the selection of two alternate jurors. After the State exercised a peremptory challenge against Mr. Jones, the following exchange occurred:
 {¶ 52} "[DEFENSE COUNSEL]: Your Honor, we'll make a Batson challenge to that particular choice.
 {¶ 53} "THE COURT: Basis?
 {¶ 54} "[DEFENSE COUNSEL]: Basis that there was nothing in his testimony that would give any cause and he's one of only two potential black people that would have been on the jury even though as an alternate.
 {¶ 55} "[PROSECUTOR]: He indicated, if I may, Your Honor, that he would prefer not to be there.
 {¶ 56} "THE COURT: Uh, in any event, I — I see no pattern. So, Mr. Engel becomes number two * * *."
 {¶ 57} Although the trial court apparently overruled Carver'sBatson challenge, the trial *Page 15 
trial court made no specific ruling on any of the three parts of theBatson tripartite test, other than noting the absence of a pattern. Although the presence of a pattern of discrimination is a factor for consideration, the defendant need not show a pattern in order to establish a Batson violation. See Batson, 476 U.S. at 95-96. As stated by the Supreme Court of Ohio:
 {¶ 58} "The existence of a pattern of discriminatory strikes isnot a prerequisite either to finding a prima facie case in step one of the Batson analysis or to finding actual discrimination in step three. Such a rule would ignore Batson's requirement that the trial court consider all the circumstances in determining whether racial discrimination occurred. It would also mean that no Batson challenge could succeed unless the prosecutor challenged more than one member of the group in question. Such a rule would license prosecutors to exercise one illegal peremptory strike per trial. The law of equal protection does not allow `one free bite.'" State v. White, 85 Ohio St.3d 433, 436,1999-Ohio-281.
 {¶ 59} In basing its ruling on the absence of a pattern of discrimination, the trial court failed to provide an adequate basis to uphold the denial of the Batson challenge. Moreover, the trial court's failure to address the Batson challenge in accordance with the tripartite test underscores the need for the trial court to provide an adequate record for appellate review.
 {¶ 60} The crucial question thus becomes whether a violation ofBatson necessarily constitutes a structural error or, on the other hand, may be deemed harmless where the Batson challenge was raised in connection with a prospective alternate juror who ultimately would not have deliberated. Structural errors are those errors that "are so intrinsically harmful as to require automatic reversal (i.e., `affect substantial rights') without regard to their effect *Page 16 
their effect on the outcome." State v. Hill, 92 Ohio St.3d 191, 196,2001-Ohio-141, quoting Neder v. United States (1999), 527 U.S. 1, 7. In other words, "[w]here structural error is found, prejudice is presumed."State v. Davis, Clark App. No. 2002-CA-43, 2003-Ohio-4839, ¶ 55.
 {¶ 61} The United States Supreme Court has not addressed whetherBatson requires the reversal of a conviction when an alternate juror is improperly excluded but is not required for deliberations. The few federal circuit courts to consider the issue have reached divergent results.
 {¶ 62} The Sixth Circuit has held that the improper exclusion of a juror — regardless of whether that juror would have been an alternate and whether that alternate would have deliberated — is structural error.United States v. Harris (C.A.6, 1999), 192 F.3d 580. The Harris court emphasized that "the harm inherent in a discriminatorily chosen jury inures not only to the defendant, but also to the jurors not selected because of their race, and to the integrity of the judicial system as a whole" and that "[t]his principle is equally applicable to the selection of alternate jurors." Id. at 587-88. The court stated: "Because the process of jury selection — even the selection of alternate jurors — is one that affects the entire conduct of the trial, the district court's decision with respect to the peremptory challenges of the alternate jurors is not subject to harmless error review." Id. at 588.
 {¶ 63} In contrast, the Ninth Circuit has repeatedly dismissed, as harmless error, the exclusion of an alternate juror when the alternates were not called upon to deliberate. Nevius v. Sumner (C.A.9, 1988),852 F.2d 463, 368; Quillar v. California (C.A.9, 2004), 116 Fed.Appx. 793. The Fourth Circuit has done likewise. United States v. Lane (C.A.4, 1989), 866 F.2d 103, 106, n. 3 (noting that, if alternate juror was not called upon to serve as member *Page 17 
member of petit jury, the defendant would not have been prejudiced by the peremptory challenge). The Ninth and Fourth Circuits provided no analysis for their approach.
 {¶ 64} Other federal circuit courts have noted the conflict among the federal circuits, but have chosen not to take a position. Carter v.Kenna (C.A.8, 2001), 255 F.3d 589; United States v. Canoy (C.A.7, 2001),38 F.3d 893, 899, n. 6.
 {¶ 65} The Supreme Court of Ohio has noted the Harris opinion by the Sixth Circuit. See, Ohio v. Were, 118 Ohio St. 3d 448, 2008-Ohio-2762. In Were, the State argued that any Batson challenge was rendered moot by the fact that the "two African-American jurors who were peremptorily challenged were alternate jurors who were never called upon to deliberate on the case." Id., ¶ 58. The Supreme Court of Ohio noted that this type of argument had been rejected by the Harris court, and that it, thus, lacked merit. Id. However, the Court's holding inWere was not based upon Batson or Harris. Instead, the Court noted that the appellant had failed to raise a Batson claim, and that he "therefore waived the issue absent a showing of plain error." Id., at ¶ 59. Thus, we conclude that the Court's reference to Harris, as it pertains toBatson, is dictum, and is therefore not binding upon us.
 {¶ 66} In our view, the Batson violation before us is subject to a harmless error analysis. The United States Supreme Court has "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal." Washington v.Recuenco (2006), 126 S.Ct. 2546. To the contrary, most constitutional errors may be harmless. Id., quoting Neder v. United States (1999),527 U.S. 1, 8, and Arizona v. Fulminante (1991), 499 U.S. 279. "`[I]f the defendant had counsel and was tried by an *Page 18 
was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.'" Id. Structural errors are limited to those errors that "affec[t] the framework within which the trial proceeds," and are not "simply an error in the trial process itself."Fulminante, 499 U.S. at 309-310; United States v. Gonzalez-Lopez (2006),126 S.Ct. 2557, 2564.
 {¶ 67} We agree with the Sixth Circuit that the exclusion of a juror for discriminatory purposes is a constitutional ill that affects not only the defendant but the jurors themselves. In circumstances where either a prospective juror or a prospective alternate juror who would have deliberated is improperly excluded, the make-up of the jury is irreparably tainted by the discrimination. We would have no difficulty holding that such an error in the exclusion of the juror or alternate juror constitutes structural error. However, while discrimination in the jury selection process is wrong, that discrimination must havesome effect on the defendant's trial in order to constitute structural error. Where the alternate jurors turn out not to have been needed to deliberate, we find no basis to conclude that the State's conduct concerning the selection of the alternate jurors had any effect, much less a prejudicial one, on the outcome of the trial.
 {¶ 68} In short, we conclude that although an error of constitutional dimensions in the process of selecting a jury in a criminal trial will ordinarily be presumptively prejudicial, there must be some plausible mechanism whereby the error might have prejudiced the defendant. Where the error merely affects the identity of the alternate juror or jurors, and the alternates are not required for deliberation on the verdict, we conclude that there is no plausible mechanism whereby the outcome of the trial may have been affected, and the presumption of prejudice does not arise. *Page 19 
 {¶ 69} Here, the jury that ultimately deliberated and rendered the verdicts in Carver's trial was not selected in a discriminatory manner. In fact, there were no Batson challenges concerning any of the members of the petit jury. Because the alternate jurors were not called upon to deliberate, Carver was not prejudiced by the state's peremptory challenge of Mr. Jones.
 {¶ 70} The Second Assignment of Error is overruled.
 IV {¶ 71} Carver's Third Assignment of Error states:
 {¶ 72} "THE TRIAL COURT ERRED BY ALLOWING THE JURY TO HEAR IRRELEVANT AND PREJUDICIAL REFERENCES TO DRUG USE THROUGHOUT THE TRIAL."
 {¶ 73} In his Third Assignment of Error, Carver claims that the trial court erred in allowing the jury to hear testimony that he used crack cocaine. He states that he was not charged with drug offenses and the references to crack were not relevant to the offenses with which he was charged. Further, he asserts that any relevance that the references to crack might have had were outweighed by the prejudice to him. We note that Carver objected during the prosecutor's opening statement when he mentioned that Carver pulled out a crack pipe and began to smoke in front of M. Carver did not object to subsequent references to his smoking crack.
 {¶ 74} In our view, the State's evidence that Carver smoked crack on August 28-29, 2003, was neither irrelevant nor unduly prejudicial. M testified that, prior to August 28, 2003, she believed Carver to be a "church-going, kind person." B also testified that Carver was *Page 20 
was "very mannerable" and "seemed like a really genuine person." M's testimony that Carver smoked crack just before going to B's apartment provided an explanation for Carver's seemingly "Jekyll and Hyde" behavior. See State v. Tibbetts, 92 Ohio St.3d 146, 2001-Ohio-132
(testimony regarding drug addiction was probative of motive to steal and kill). B's testimony that Carver smoked crack at her apartment and blamed his behavior on his crack usage bolstered this theory. Although this evidence may have been prejudicial to Carver, the probative value of the testimony outweighed the prejudicial impact. The trial court thus did not err in allowing the jury to hear evidence of Carver's drug use.
 {¶ 75} The Third Assignment of Error is overruled.
 V {¶ 76} Carver's Fourth Assignment of Error provides as follows:
 {¶ 77} "THE TRIAL COURT ERRED BY SENTENCING MR. CARVER FOR FIFTH DEGREE FELONY UNAUTHORIZED USE OF A VEHICLE AND FIRST DEGREE FELONY KIDNAPPING WHEN THE GUILTY VERDICTS FAILED TO STATE THE DEGREE OF THE OFFENSES OR THAT ANY ADDITIONAL ELEMENTS WERE PRESENT."
 {¶ 78} In his Fourth Assignment of Error, Carver claims that the trial court erred in sentencing him for a fifth-degree felony Unauthorized Use of a Vehicle and for a first-degree Felony Kidnapping. Carver claims that the court was required to sentence him to the least degree of the offense charged, because the verdict forms did not indicate the degree of the offense. Carver relies upon State v. Pelfrey, 112 Ohio St.3d 422,2007-Ohio-256, in which the Supreme Court of Ohio held: "Pursuant to the clear language of R.C. 2945.75, a verdict *Page 21 
2945.75, a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." Id. at syllabus.
 {¶ 79} Of relevance to this assignment of error, Carver was charged with Unauthorized Use of a Vehicle, in violation of R.C. 2913.03(B), and Kidnapping, in violation of R.C. 2905.01(A)(4). R.C. 2913.03(D) sets forth the penalties for violations of R.C. 2913.03. R.C. 2913.03(D) states, in relevant part:
 {¶ 80} "(3) Except as otherwise provided in division (D)(4) of this section, a violation of division (B) of this section is a felony of the fifth degree.
 {¶ 81} "(4) If the victim of the offense is an elderly person or disabled adult and if the victim incurs a loss as a result of the violation, a violation of division (A) or (B) of this section is whichever of the following is applicable:
 {¶ 82} "(a) Except as otherwise provided in division (D)(4)(b), (c), (d), or (e) of this section, a felony of the fifth degree;
 {¶ 83} "(b) If the loss to the victim is five hundred dollars or more and is less than five thousand dollars, a felony of the fourth degree;
 {¶ 84} "(c) If the loss to the victim is five thousand dollars or more and is less than twenty-five thousand dollars, a felony of the third degree;
 {¶ 85} "(d) If the loss to the victim is twenty-five thousand dollars or more, a felony of the second degree."
 {¶ 86} As noted by the State, the jury's verdict on the Unauthorized Use charge was a finding of guilty on the least degree of the charged offense. Accordingly, the trial court did not *Page 22 
did not err in sentencing him for a fifth-degree felony.
 {¶ 87} The same is true for the Kidnapping charge. R.C. 2905.01(C), which sets forth the penalties for violation of R.C. 2905.01(A)(4), states: "Whoever violates this section is guilty of kidnapping, a felony of the first degree. If the offender releases the victim in a safe place unharmed, kidnapping is a felony of the second degree." Whether the victim is released in a safe place unharmed is not an element of the offense. State v. Sanders, 92 Ohio St.3d 245, 265, 2001-Ohio-189. Rather, it is in the nature of an affirmative defense, and the defendant bears the burden of proof on this issue. Id.; State v. Jennings (Jan. 24, 1996), Clark App. No. 94-CA-611. Because Carver failed to assert and prove that he released B in a safe place unharmed, the trial court properly sentenced him for Kidnapping as a first-degree felony.
 {¶ 88} The Fourth Assignment of Error is overruled.
 VI {¶ 89} Carver's Fifth Assignment of Error states as follows:
 {¶ 90} "THE TRIAL JUDGE ABUSED HER DISCRETION BY SUA SPONTE DECLARING A MISTRIAL ON COUNTS IV AND VII UPON WHICH THE JURY FAILED TO REACH A UNANIMOUS VERDICT."
 {¶ 91} In his Fifth Assignment of Error, Carver claims that the trial court abused its discretion in declaring a mistrial as to counts four (Rape) and seven (Gross Sexual Imposition), because the court did not "do enough to determine that the jury was deadlocked as to those counts." *Page 23 
 {¶ 92} "`[T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes * * *' U.S. v. Perez (1824), 22 U.S. 579, 580. `In evaluating whether the declaration of a mistrial was proper in a particular case, [courts have] declined to apply inflexible standards, due to the infinite variety of circumstances in which a mistrial may arise. * * * [T]he trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial. * * * In examining the trial judge's exercise of discretion in declaring a mistrial, a balancing test is utilized, in which the defendant's right to have the charges decided by a particular tribunal is weighed against society's interest in the efficient dispatch of justice.' State v. Glover, 35 Ohio St.3d 18, 19." State v. Wilson, Montgomery App. No. 21185, 2006-Ohio-3033, ¶ 4.
 {¶ 93} As noted by Carver, the jury deliberated for approximately three hours after receiving the case on Friday, September 30, 2005. Deliberations continued on Monday. During the morning, the jury sent several questions to the court for clarification. After the lunch recess, the court reconvened, and the following colloquy occurred:
 {¶ 94} COURT: "It's my understanding that you have reached verdicts on some Counts and not others, is that — is that . . .
 {¶ 95} FOREWOMAN: "Yes, Your Honor.
 {¶ 96} COURT: "Okay. Do you believe as forewoman of this Jury that further *Page 24 
deliberations would do any good?
 {¶ 97} FOREWOMAN: "No, I don't.
 {¶ 98} COURT: "Do you believe that as to the Counts that you have not reached a Verdict on, that the Jury is deadlocked and will remain dead — deadlocked despite additional time?
 {¶ 99} FOREWOMAN: "Yes, I do."
 {¶ 100} We find no abuse of discretion in the trial court's subsequent grant of a mistrial on the two counts for which the jury could not reach a verdict. The jury had deliberated for approximately seven and one half hours over two days, asking three multi-part questions of the court in the process. The forewoman indicated that the jury was deadlocked and that further deliberations would be futile. The court was not required to question the jurors individually or to order additional deliberations.
 {¶ 101} The Fifth Assignment of Error is overruled.
 VII {¶ 102} Carver's Sixth Assignment of Error is as follows:
 {¶ 103} "THE TRIAL COURT ERRED BY FINDING THAT MR. CARVER IS A SEXUALLY ORIENTED OFFENDER IN ITS AMENDED TERMINATION ENTRY."
 {¶ 104} In his Sixth Assignment of Error, Carver claims that the trial court erred in finding him to be a sexually oriented offender when the verdict forms for Felonious Assault and Kidnapping did not indicate that the conduct was done with a sexual motive.
 {¶ 105} Carver's assignment of error is based on the faulty premise that the verdict form itself must set forth the specific subsection under which he was convicted. To *Page 25 
the contrary, a verdict form may clarify the offense by referencing the indictment.
 {¶ 106} In this case, Count Eight of the indictment alleged a violation of R.C. 2905.01(A)(4), which sets forth a charge of Kidnapping for the purpose of "engag[ing] in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." A violation of R.C. 2905.01(A)(4) qualifies as a "sexually oriented offense" under R.C. 2950.01(D)(1)(c), because it involves a sexual motivation. See State v. Matthieu, Mercer App. Nos. 10-02-04, 10-02-05, 2003-Ohio-3430, ¶ 25; State v. Smith, Summit App. Nos. 23468, 23464,2007-Ohio-5524, ¶ 41. Accordingly, the trial court did not err in classifying Carver as a sexually oriented offender in its amended judgment entry.
 {¶ 107} The Sixth Assignment of Error is overruled.
 VIII {¶ 108} Carver asserts the following for his Seventh Assignment of Error:
 {¶ 109} "MR. CARVER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."
 {¶ 110} In his Seventh Assignment of Error, Carver claims that his trial counsel rendered ineffective assistance by failing to file a motion to suppress the buccal swabs, which were obtained at the conclusion of his police interview in February 2005. Carver further claims that his trial counsel was ineffective when he failed to object to: (1) his convictions for more than the least degree of the offenses of Kidnapping and Unauthorized Use of a Vehicle; (2) the trial court's declaration of a mistrial as to one count of Rape and of Gross Sexual *Page 26 
Gross Sexual Imposition; and (3) the trial court's imposition of non-minimum and consecutive sentences. Carver's arguments are without merit.
 {¶ 111} In order to demonstrate ineffective assistance of counsel, Carver must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. Strickland v. Washington (1984),466 U.S. 668; State v. Bradley (1989), 42 Ohio St.3d 136. "Reversal of a conviction for ineffective assistance of counsel `requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" State v.Hand, 107 Ohio St.3d 378, 2006-Ohio-18,¶ 199. Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S at 694;Bradley, 42 Ohio St.3d at 142.
 {¶ 112} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. SeeStrickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.;State v. Parker, Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 A. Failure to File a Motion to Suppress Buccal Swabs {¶ 113} Carver first claims that his trial counsel should have filed a motion to suppress the buccal swabs, which were obtained at the conclusion of the unlawful *Page 27 
interrogation. Carver's argument fails for several reasons.
 {¶ 114} First, Carver cannot demonstrate that he would have prevailed on his motion to suppress the buccal swabs had his counsel filed such a motion. As noted by the trial court in granting Carver's motion to suppress the statements he made after invoking his Miranda right to counsel, once a suspect requests counsel, the police must cease their interrogation until an attorney has been provided or the suspect himself reinitiates conversation. Edwards v. Arizona (1981), 451 U.S. 477,484-85. However, even after a suspect has invoked his right to counsel after Miranda warnings, the police are not prohibited from asking a suspect to consent to a search. See, e.g., U.S. v. LaGrone (C.A.7, 1994), 43 F.3d 332 (request for consent to search is not interrogation under Miranda). Accordingly, consent given after the invocation ofMiranda rights is valid as long as it is voluntary. Although physical evidence derived from statements made in violation of Miranda is subject to suppression, State v. Farris, 109 Ohio St.3d 519, 2006-Ohio-3255, physical evidence obtained pursuant to the voluntary consent of the defendant is not.
 {¶ 115} At the suppression hearing, Detective Shane Sullins testified that Detective Ward had asked Carver for a DNA sample and that Carver had consented to the buccal swabs. He specifically stated that Ward had not demanded it. Based on the record, Carver has not established that there is a reasonable probability that he would have prevailed on a motion to suppress the buccal swabs.
 {¶ 116} Second, the record reflects that Carver chose to forego the filing of a motion to suppress. Carver was indicted on March 10, 2005. On March 30, 2005, Carver's initial counsel, Brian Weaver, filed a motion to suppress Carver's statements to the police. On April 20, 2005, Mr. Weaver requested permission to withdraw as counsel due to a *Page 28 
breakdown in communications with Carver, and the court appointed Jack Harrison as Carver's new counsel. The court gave Mr. Harrison an opportunity to supplement the motion to suppress, but that was not done. After a hearing, the motion to suppress Carver's statements was sustained on May 27, 2005. On June 7, 2005, Mr. Harrison requested leave to withdraw as counsel, which the court granted. Attorney Al Wilmes was assigned to represent Carver. Against Carver's wishes, Mr. Wilmes filed a suggestion of incompetency and a proposed plea of not guilty by reason of insanity. There was a delay until September 14, 2005, when the court found that Carver was competent to stand trial; an entry to that effect was filed on September 20, 2005. At that competency hearing, Wilmes represented to the court that Carver wished to have new counsel. After a discussion with the judge, Carver decided to remain with Mr. Wilmes. Carver's decision was based, in part, on his desire not to have any more continuances or to waive his speedy trial rights.
 {¶ 117} On September 26, 2005, a hearing was held on Carver's motion to dismiss and his request for a bill of particulars. At that hearing, Mr. Wilmes stated on the record:
 {¶ 118} "* * * I would simply add that I have counseled this Defendant of his entitlement to file a number of motions, one being a motion to suppress the DNA which was taken from his mouth at the time of his arrest, and also another one to ask for an appointment of an independent physician to review the medical reports, photos of the victim to perhaps be able to interpret them differently than the State does.
 {¶ 119} "And if I may also, I think that's it. I think those are the two — well, actually, in addition, a medical expert to review the DNA findings to — not to retest it for DNA *Page 29 
DNA because the Court would not afford that, but to review the findings to see if another interpretation or any defect in apparent testing was done.
 {¶ 120} "Those are all options. I'm not saying the Court would grant them, but they're all motions that I've made the Defendant aware of and that we could file. However, filing them now would required [sic] a delay of a few weeks in his trial and a continuance. So, I'm going to leave that up to him as to whether he wants to seek the continuance, have the motions filed or as he said earlier, forge ahead with the trial."
 {¶ 121} The court then asked Carver if he wished to go forward with the trial, which was scheduled for September 28, two days later. Carver responded affirmatively. On the morning of September 28, Carver reiterated that he did not want additional delays.
 {¶ 122} The record thus establishes that Carver's defense counsel made him aware that he could file a motion to suppress the DNA evidence. But Carver chose to forego the filing of that motion in favor of asserting his speedy trial rights and avoiding the delays attendant to the filing of motions. Carver cannot now complain that his trial counsel should have filed the motion to suppress against his wishes.
 {¶ 123} Finally, Carver has failed to demonstrate that he was prejudiced by the introduction of the DNA evidence at trial. Although the DNA evidence corroborated B's testimony that Carver had intercourse with her, Carver was acquitted of four Rape counts and the jury did not reach a verdict on the remaining Rape count and the Gross Sexual Imposition charge; the State subsequently dismissed without prejudice the charges for which no verdict was reached. The convictions for Unauthorized Use of a Vehicle, Felonious Assault, and Kidnapping were not dependent on the DNA evidence. Moreover, because B knew her assailant, identity was not much in doubt. *Page 30 
 {¶ 124} Accordingly, Carver has not established that his trial counsel was ineffective for failing to file a motion to suppress the buccal swabs.
 B. Failure to Object {¶ 125} Carver next asserts that his trial counsel should have objected to his convictions for Unauthorized Use of a Vehicle and Kidnapping, to the trial court's grant of a mistrial on the charges for which the jury could not reach a verdict, and, citing Blakely v.Washington, 542 U.S. 296, to his non-minimum and consecutive sentences. We have concluded, supra, that Carver was properly convicted of the Unauthorized Use charge as a fifth-degree felony and of Kidnapping as a first-degree felony. We have also concluded, supra, that the trial court did not err in granting a mistrial on the Rape and Gross Sexual Imposition charges for which the jury did not reach a verdict. Accordingly, Carver's counsel was not ineffective for failing to object to these actions.
 {¶ 126} As for sentencing, nothing in the record suggests that Carver would have received a more lenient sentence had he been sentenced in accordance with Blakely and Foster. See State v. Davis,116 Ohio St.3d 404,2008-Ohio-2, ¶ 376. Accordingly, Carver has failed to establish that he was prejudiced by his counsel's failure to object.
 {¶ 127} The Seventh Assignment of Error is overruled.
 IX {¶ 128} The Eighth Assignment of Error is as follows:
 {¶ 129} "THE TRIAL COURT ERRED BY SENTENCING MR. CARVER TO MAXIMUM AND CONSECUTIVE PRISON TERMS BASED ON FACTFINDING IN *Page 31 
ACCORDANCE WITH STATUTES THAT HAVE BEEN DECLARED UNCONSTITUTIONAL BY THE OHIO SUPREME COURT."
 {¶ 130} Next, Carver asserts that the trial court erred in making factual findings under R.C. 2929.14(B), R.C. 2929.14(C), and R.C. 2929.14(E)(4) to support his maximum and consecutive sentences. Carver notes that the Supreme Court of Ohio has held that these provisions are unconstitutional, and severed them from the sentencing statute.State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856. Carver further argues that Foster amounts to an ex post facto law, and thus he is entitled to a minimum, concurrent sentence.
 {¶ 131} As noted above, Carver's attorney failed to object underBlakely when the trial court imposed maximum and consecutive sentences. The Supreme Court of Ohio recently held that "a lack of an objection in the trial court forfeits the Blakely issue for purposes of appeal when the sentencing occurred after the announcement of Blakely." State v.Payne, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 31. Accordingly, Carver has waived his objection to the trial court's fact-finding.
 {¶ 132} Although a plain-error analysis is still available, Carver has failed to demonstrate that the trial court's imposition of maximum and consecutive sentences amounted to plain error. Since Foster, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than minimum sentences." Foster at ¶ 100. As stated above, nothing in the record suggests that Carver would have received a more lenient sentence had the trial court not made factual findings under the unconstitutional statutes. See Davis at ¶ 376. Accordingly, Carver has failed to establish that he was prejudiced by the judicial fact-finding. *Page 32 
 {¶ 133} As to Carver's assertion that Foster constitutes an ex post facto law, we have repeatedly rejected this same argument. See, e.g.,State v. Smith, Montgomery App. No. 21833, 2007-Ohio-2976 (citing cases).
 {¶ 134} The Eighth Assignment of Error is overruled.
 X {¶ 135} Carver's Ninth Assignment of Error provides:
 {¶ 136} "MR. CARVER WAS DENIED A FAIR TRIAL UNDER BOTH THE UNITED STATES AND OHIO CONSTITUTIONS DUE TO THE CUMULATION OF ERRORS."
 {¶ 137} Under Carver's Ninth Assignment of Error, he argues that the cumulative
weight of the errors denied him a fair trial. As discussed above, Carver's trial was not totally free from error. However, none of the errors that we have identified was prejudicial to him. Although the Supreme Court of Ohio has stated that numerous harmless errors may cumulatively deprive a defendant of a fair trial and thus may warrant the reversal of his conviction, State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus, upon a complete review of the record, we do not conclude that prejudicial error exists in this case.
 {¶ 138} The Ninth Assignment of Error is overruled.
 XI {¶ 139} The Tenth Assignment of Error states as follows: *Page 33 
 {¶ 140} "MR. CARVER WAS CONVICTED OF AND SENTENCED FOR KIDNAPPING EVEN THOUGH THE INDICTMENT WAS DEFECTIVE IN THAT IT FAILED TO CHARGE AN ESSENTIAL ELEMENT OF THE OFFENSE IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW UNDER BOTH THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 141} Carver contends that his conviction for Kidnapping must be reversed because the State failed to properly indict him. Specifically, Carver argues that the Kidnapping statute, R.C. 2905.01, does not specify a mens rea. Therefore, he contends that pursuant to R.C. 2901.21(B) recklessness is the culpable mental state for such an offense. He further argues that "the indictment, the prosecution arguments, and the jury instructions all failed to include the mental state of recklessness." Therefore, he claims that the indictment was rendered so defective as to violate his constitutional rights pursuant to the holding in State v. Colon, 118 Ohio St. 3d 26,2008-Ohio-1624.[1]
 {¶ 142} R.C. 2905.01 provides in relevant part as follows:
 {¶ 143} "(A) No person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 144} "(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."
 {¶ 145} Contrary to Carver's assertion, this statute does set forth a mens rea: any *Page 34 
any of the purposes specifically set forth in the statute — in this case, the purpose to engage in sexual activity against the victim's will. This court has held that the mens rea of the statute is purpose.State v. Garrett, Clark App. No. 2003 CA 40, 2004-Ohio-6876, reversed on other grounds by In re Ohio Criminal Sentencing Statute Cases.109 Ohio St. 3d 313, 2006-Ohio-2109. See also, State v. Whitt, Cuyahoga App. No. 82293, 2003-Ohio-5934, ¶ 22, and State v. Maurer (1984),15 Ohio St. 3d 239-270.
 {¶ 146} We reject Carver's claim that the statute does not set forth a mens rea. Therefore, we need not address his claim that his conviction must be reversed pursuant to Colon, supra. In any event, a review of the record also indicates that the indictment properly set forth the purpose mens rea, and that the trial court properly gave an instruction in accord with the Ohio Jury Instructions on Kidnapping.
 {¶ 147} Carver's Tenth Assignment of Error is overruled.
 XII {¶ 148} All of Carver's assignments of error being overruled, the judgment of the trial court is Affirmed.
BROGAN, J., and WALTERS, J., concur
(Hon. Sumner E. Walters, retired from the Third Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)
 Copies mailed to: *Page 35 
Hon. Barbara P. Gorman
[1] Since the filing of Carver's supplemental appellate brief, the Ohio Supreme Court, in reconsideration, has limited the holding ofColon in State v. Colon, Slip Opinion No. 2008-Ohio-3749. *Page 1