[Cite as *State v. McConnell*, 2019-Ohio-2838.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-97 |
| | : | |
| v. | : | Trial Court Case Nos. 2018-CR-270 & |
| | : | 2018-CR-76B |
| ANDY MCCONNELL, III | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of July, 2019.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
        Attorney for Plaintiff-Appellee

KIRIAKOS G. KORDALIS, Atty. Reg. No. 0089697, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Andy McConnell, III, appeals his conviction and sentence for the following offenses: one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree, accompanied by a firearm specification; one count of carrying a concealed weapon, in violation of R.C. 2923.12(A), a felony of the fourth degree; and one count of improper handling of a firearm in a motor vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree. McConnell filed a timely notice of appeal with this Court on August 31, 2018.

{¶ 2} The record establishes that on the morning of January 20, 2018, Jimmarko Shepherd was driving a white Jeep when he pulled the vehicle into the parking lot of a Lo-Cost gas station located on Selma Road in Springfield, Ohio. Shepherd testified that also in the vehicle at that time were defendant-appellant McConnell sitting in the front passenger seat and an unidentified male passenger sitting in the backseat. Shepherd testified that after parking the vehicle near the gas pumps, he got out, went inside the store, and purchased a single cigarette. Shepherd testified that he then exited the gas station, got back into the Jeep, and drove to a nearby apartment complex, where they remained for a short time.

{¶ 3} Shepherd testified that, shortly thereafter, he and McConnell returned to the gas station with the stated intention of putting air in the Jeep's tires and buying cigars. McConnell told Shepherd to wait in the vehicle while he went into the store. Once inside the store, McConnell, who had covered the lower part of his face with a bandana, walked up to the counter carrying a handgun and demanded money from the store clerk. The clerk gave McConnell $300 from the cash register. McConnell then left the store and got back in the vehicle with Shepherd, whom he told to "drive." Shepherd testified that as

they drove away, he observed McConnell pull out a handgun and begin counting money.

{¶ 4} After McConnell fled the scene, the store clerk called the owner of the store in order to advise him of the robbery. The owner then called the police, who arrived at the store shortly thereafter. The owner filled out a police report and turned over a surveillance video containing footage of the robbery. Using the surveillance video, the police were able to create a presentation packet regarding the robbery and the perpetrator of the robbery to show law enforcement officers at the beginning of their shifts. Specifically, the packet included photographs of the robbery suspect from inside the store and photographs of the white Jeep parked outside the store. The Jeep was distinctive because it was missing a hubcap and had out-of-state license plates. The robbery suspect, although he had a bandana covering his mouth, was distinctive because he had an abnormal right eye that was plainly visible in the photographs. Police detectives distributed the packet to patrol officers before they began their shifts on January 24, 2018.

{¶ 5} Springfield Police Officer Zack Massie was one of the officers who was shown the photographs in the packet. While on patrol on January 24, 2018, Officer Massie observed a white Jeep matching the description of the vehicle from the robbery. The vehicle contained four individuals. Officer Massie also observed that the Jeep was missing one hubcap and had Georgia license plates, which were expired. On the basis of the expired tags, Officer Massie initiated a traffic stop of the vehicle. Officer Massie testified that, when he walked up to the vehicle, he observed that the driver, McConnell, had an abnormal right eye identical to the robbery suspect from the surveillance photographs. Officer Massie also testified that when he approached the vehicle, he detected the odor of burnt marijuana. Officer Massie testified that he removed everyone

from the vehicle, and he searched McConnell. Thereafter, the interior of the vehicle was searched, and Officer Massie located a .380 caliber semi-automatic handgun under the driver's seat. McConnell was arrested and taken into custody.

{¶ 6} On February 5, 2018, McConnell was indicted in Clark C.P. No. 18-CR-0076B for one count of aggravated robbery accompanied by a firearm specification. On April 3, 2018, McConnell filed a motion to suppress any physical evidence removed from the Jeep as well as any statements he made to police before being given *Miranda* warnings. McConnell also sought suppression of the DNA test results linking him to the handgun taken from the vehicle. On April 23, 2018, the State filed a second indictment in Clark C.P. No. 18-CR-270 charging McConnell with carrying a concealed weapon and improper handling of a firearm.

{¶ 7} A hearing was held regarding McConnell's motion to suppress on May 25, 2018. On June 12, 2018, the trial court issued a decision overruling McConnell's motion to suppress. On August 10, 2018, the State filed a motion to consolidate Case Nos. 18-CR-0076B and 18-CR-270 for trial. The trial court granted the State's motion to consolidate on August 14, 2018.

{¶ 8} On August 21 and 22, 2018, McConnell's jury trial was held. McConnell was found guilty and convicted of aggravated robbery with a firearm specification in Case No. 18-CR-0076B and carrying a concealed weapon and improper handling of a firearm in Case No. 18-CR-270. The trial court sentenced McConnell to eleven years in prison for aggravated robbery plus an additional three years for the attendant firearm specification. The trial court merged McConnell's convictions for carrying a concealed weapon and improper handling of a firearm, and he was sentenced to one year for carrying a

concealed weapon.   The trial court ordered that all sentences be served consecutively for an aggregate sentence of 15 years in prison.

{¶ 9} It is from this judgment that McConnell now appeals.

{¶ 10} McConnell's first assignment of error is as follows:

THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO SUPPRESS.   MORE SPECIFICALLY NO PROBABLE CAUSE EXISTED TO SEARCH THE AUTOMOBILE.

{¶ 11} In his first assignment, McConnell contends that the trial court erred when it overruled his motion to suppress because Officer Massie did not have probable cause to search the white Jeep.   Specifically, McConnell argues that Officer Massie did not testify that he had any experience that qualified him to detect the odor of burnt marijuana. Thus, McConnell argues that Officer Massie did not have probable cause to perform a warrantless search of the Jeep.   However, even if Officer Massie was not qualified to recognize the smell of burnt marijuana, he had probable cause to stop and search McConnell's vehicle based upon McConnell's suspected involvement in the robbery of the gas station, because of the similarities between the surveillance photographs and McConnell's vehicle and his abnormal right eye.

{¶ 12} As this Court has previously noted, appellate courts give great deference to the factual findings of the trier of fact.

* * * At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. * * * The trial court is in the best position to resolve questions of fact and evaluate witness credibility. * * *   In reviewing a trial court's

decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. * * * An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. *State v. Hurt*, 2d Dist. Montgomery No. 21009, 2006-Ohio-990, ¶ 16.

(Internal citations omitted.) *State v. Purser*, 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 13} Initially, we note that the only witnesses who testified at the hearing on McConnell's motion to suppress were Officer Massie and Detective Ronald W. Jordan. The trial court found their testimony credible and adopted it as the court's factual findings.

**The Initial Traffic Stop**

{¶ 14} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. The existence of reasonable suspicion is determined by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State*

*v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991).

**{¶ 15}** " 'Reasonable, articulable suspicion' is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.' " *State v. Fears*, 8th Dist. Cuyahoga No. 94997, 2011-Ohio-930, ¶ 5, citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *State v. Scott*, 2d Dist. Clark No. 2013 CA 104, 2014-Ohio-4963, ¶ 12. Where a police officer stops a vehicle based on reasonable suspicion that a traffic violation has occurred, or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution, even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23, citing and clarifying *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), syllabus; *see also Whren v. United States*, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (an ulterior motive does not vitiate legal justification).

**{¶ 16}** In the instant case, believing the officers' testimony that McConnell was stopped because of a traffic violation, the trial court properly determined that Officer Massie validly stopped the vehicle. This is true even though Officer Massie suspected that the white Jeep was the same vehicle used in the robbery of the gas station on January 20, 2018. Thus, even though Officer Massie may have also desired to investigate the occupants' potential involvement in the robbery, the stop of McConnell's vehicle did not violate the Fourth Amendment because Massie had observed a traffic violation: his vehicle's expired tags. *See Mays at ¶23; Erickson* at syllabus*.*

**Warrantless Search of Vehicle**

{¶ 17} The trial court relied upon the automobile exception in denying McConnell's motion to suppress. Under the automobile exception, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband, and exigent circumstances necessitate a search. *State v. Mills*, 62 Ohio St.3d 357, 367, 582 N.E.2d 972 (1992); *Chambers v. Maroney*, 399 U.S. 42, 48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). A vehicle's mobility is the traditional exigency for this exception to the warrant requirement, and no other exigency is required. *Mills* at 367; *Maryland v. Dyson*, 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); *California v. Carney*, 471 U.S. 386, 393, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment * * * permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996).

{¶ 18} As previously stated, prior to the beginning of his shift on January 24, 2018, Officer Massie viewed photographs of the robbery suspect from inside the store and photographs of the white Jeep parked outside the store. The Jeep was distinctive because it was missing a hubcap and had out-of-state license plates. Although he had a bandana covering his mouth, the robbery suspect was distinctive because he had an abnormal right eye that was plainly visible in the photographs.

{¶ 19} While Officer Massie testified that he initially pulled the Jeep over because it had expired tags,[1] he already had probable cause to believe that the vehicle was the

---

[1] The record establishes that McConnell was ultimately cited by Officer Massie for the expired license plates.

same one used in the robbery of the gas station. Furthermore when he approached the vehicle, he observed that McConnell had the same abnormal condition affecting his right eye as did the robbery suspect from the surveillance photographs. Therefore, Officer Massie had probable cause to believe that McConnell was the individual who robbed the gas station four days earlier. Based upon these observations, Officer Massie possessed the probable cause necessary to remove all of the individuals from the vehicle and to search the passenger compartment of the vehicle which included under the driver's seat where the handgun was located. When probable cause is found to exist under the facts and circumstances of a given case, law enforcement officers have the necessary constitutional justification to explore any areas in the vehicle. *State v. Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, ¶ 33; *451 *State v. Welch*, 18 Ohio St.3d 88, 92, 480 N.E.2d 384 (1985).

{¶ 20} Because Officer Massie had probable cause to conduct a warrantless search of the passenger compartment of the vehicle for contraband, his subsequent discovery of the handgun under the driver's seat did not violate McConnell's Fourth Amendment rights. Accordingly, the trial court did not err when it overruled McConnell's motion to suppress.

{¶ 21} McConnell's first assignment of error is overruled.

{¶ 22} McConnell's second assignment of error is as follows:

THE DEFENDANT'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION UNDER THE OHIO AND THE UNITED STATES CONSTITUTIONS WERE VIOLATED WHEN THE STATE EXCLUDED AN AFRICAN-AMERICAN JUROR WITHOUT PROVIDING A

SATISFACTORY RACE-NEUTRAL REASON AND WITHOUT HAVING THE COURT CORRECTLY APPLYING THE LAW.

{¶ 23} In his second assignment, McConnell argues that the trial court erred when, over defense counsel's objection, it permitted the State to exercise a peremptory challenge against an African-American female juror, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During voir dire, the State exercised a challenge to the juror in question for the following reasons: 1) she was a single homeowner and would have to take vacation time from her job in order to remain on the jury; 2) she stated that she been the victim of a violent crime in 1999 and was familiar with one of the detectives in McConnell's case and believed him to "be a good man"; and 3) that she was Facebook friends with a person who was potentially related to McConnell (his father). McConnell contends that the State failed to offer a sufficiently race-neutral explanation necessary to excuse the juror. McConnell also argues that the trial court decision to ultimately allow the State to excuse the juror was made in error because it failed to correctly apply the law.

{¶ 24} The Supreme Court of Ohio has addressed the appropriate standard of review for a claim of racial discrimination in jury selection, as follows:

Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. See *Batson* [*v. Kentucky*, 476 U.S. 79,] at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21 [1986]. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination.

*Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 101, 676 N.E.2d 872 (1997).

{¶ 25} When reviewing an argument that the trial court should not have accepted the grounds for the peremptory challenge, "[t]he finding of the trial court, because it turns largely on the evaluation of credibility, is entitled to deference on appeal and will not be reversed unless clearly erroneous." *State v. Jones*, 2d Dist. Montgomery No. 26819, 2016-Ohio-5728, ¶ 8, citing *State v. Herring*, 94 Ohio St.3d 246, 257, 762 N.E.2d 940 (2002).

{¶ 26} In *Batson*, the U.S. Supreme Court set forth a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated:

"First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Batson*, 476 U.S. at 82. "In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race." *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 48 (citations omitted). "The trial court must 'consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present.' " *Id.*, quoting *Batson* * * * at 96-97.

"Second, once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-

neutral explanation for the peremptory challenge 'related to the particular case to be tried.' " *Id.* at ¶ 49, quoting *Batson*, *supra*, at 98. "Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation 'need not rise to the level justifying exercise of a challenge for cause.' " *Id.*, quoting *Batson*, *supra*, at 97. "In fact, the prosecutor's explanation for striking the prospective juror is not required to be persuasive, or even plausible." *Id.* " 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.*, quoting *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

"Third, the trial court must determine 'whether the defendant has carried his burden of proving purposeful discrimination.' " *Id.* at ¶ 50, quoting *Batson*, *supra*, at 82. "In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a 'pretext' for unconstitutional discrimination." *Id.*, citing *Hernandez v. New York* (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395. "Because this third stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference." *Id.* (Citations omitted.)

*State v. Greene*, 2d Dist. Montgomery No. 24307, 2011-Ohio-4541, ¶ 7-9.

{¶ 27} During voir dire, the following exchanges occurred with Juror #2, the juror

in question:

> [The State]: Does anybody know or believe they know the defendant in this matter, Andy McConnell or any of his relatives?   [Juror #2]?
>
> Juror #2: Yes.
>
> Q: Who do you know or what do you know?
>
> A: When you said McConnell, I was friends on Facebook with a McConnell who recently passed.   I'm not sure.   I don't recognize him, but I don't know if you're related or not.
>
> Q: Again, I don't know.   Is there anything about that that you would have been friends or potentially friends with somebody who was related to the defendant that you couldn't be fair and impartial today?
>
> A: No.

Tr. 17.

> * * *
>
> [The State]: [Juror #2], how are you today?
>
> A: Good.
>
> Q: What are your thoughts about coming down here today?
>
> A: Well, we get paid for eight hours over a ten-hour shift or ten hours over an eight hour and have been since August 1.   I sure hate to miss all of that.
>
> Q: So by being here, you're literally losing money out of your pocket?
>
> A: Yes.
>
> Q: Is that something that's going to weigh on you?
>
> A: Yes.   I am a single homeowner.

Q: If we do keep you on the jury, do you think that you would be a good juror for us?

A: Oh, that doesn't reflect on the pay.

Q: No, I mean in general. Not worrying about your work, just in general, do you think you would be a good juror?

A: Yes. Because I am a Christian first of all, and I believe in both sides of the story.

Q: Absolutely. That's really all we can do is hear both sides of the story and see if we figure out the truth from that, correct?

A: Yes.

Q: Anything else that you're concerned about? Just the work is the main issue for you, correct?

A: That's it.

Tr. 32-34.

* * *

[Defense Counsel]: So the State goes through all of its witnesses. Before I do that, I want to – [the prosecutor], you saw me go over and talk to him a minute ago. I asked him if he was going to call Detective Dewine to testify today, and he said maybe, maybe not. Does anyone know Detective Dewine? [Juror #2], how do you know Detective Dewine?

Juror #2: My family, my mother and my sister or well, my mom's sister, I think she babysat for his kids.

Q: Anything about your knowledge of Detective Dewine prevent you from

being a fair and impartial juror here today?

A: No.   I also know he was involved in the case that I had the assault on in '99.

Q: Detective Dewine was?

A: Yes.

Q: Okay.   Would that affect your ability to be fair and impartial?

A: No.

Q: You don't have any feelings about Detective Dewine one way or the other based on his handling your case?

A: No.   He's a good man.

Tr. 53-54.

* * *

The Court: Peremptory challenge for the State?

[The State]: We would thank Juror #2, * * *, and allow her to go to work.

* * *

Defense Counsel: Judge, can we approach?

The Court: Sure.   Hold on a second, [Juror #2].

   (Conference at the bench without the hearing of the jury, as follows)

      Defense Counsel: Judge, for the record [Juror #2] is an African-American juror and in the entire pool there is [sic] only two African-Americans.   One is sitting as one of the potential twelve; the other has not been called yet.   Now, [Juror #2] said repeatedly that she can be fair and impartial in this case, and that she can be fair and impartial even if she has

to miss work. She has said that she has vacation time that she can take that would enable her to miss work, so it's a Batson challenge. There's no reason to excuse the only African-American juror on the jury pool.

The Court: Before the State responds, I don't know if it makes much difference, but I think there is one African-American present in the box, and I think that there's two [sic] in the back of the courtroom.

[Defense Counsel]: Oh, you're right.

The Court: There is one juror seated over there behind the defendant's family, and I think she came in a little later and sat down and –

Court Reporter: Did you say she's the defendant's cousin?

The Court: Well, we'll worry about that when we get there. So I think there is [sic] three African-American prospective jurors in the back of the courtroom, and one is in the box.

The State: Just the response of that, Your Honor, [Juror #2] brought up the fact that just in general she had an issue for her specifically about missing work, and when we went back and she explained that she was a single household owner and it would hurt her but she could take vacation time to do that.

In addition to that, Your Honor, she also was a Facebook friend with an Andy McConnell and now, I don't know –

* * *

In addition to that, Your Honor, the fact that she has to take vacation time to be here, the fact that she also knew McConnell on Facebook wasn't

sure if that was a relative of McConnell and frankly, with her answering the questions about knowing Dan Dewine and her relative was a baby-sitter and her being a victim of a crime and Detective Dewine was on that case and everything worked out in a positive way, I would have no issue with her being a juror or the fact now having to miss work or taking vacation time to do so, Your Honor, so I believe in looking at the challenge itself the State has provided multiple race neutral reasons why this juror would be excused at this time.

[Defense Counsel]: Except for the fact, Judge, that [Juror #2] said in [sic] she still believes that she would be a good juror and be a fair and impartial juror. She worked out in her own mind how to resolve the work issue.

With regard to the Andy McConnell thing she says has no idea if that's who she's talking to on the Facebook, if it's any relationship to the McConnell here in the courtroom, and I believe that she either said or certainly implied that the person talking to on the Facebook is not the defendant in this case so there is - - She has no idea who that person is, and it was never brought out if there was anything said on Facebook that might affect her ability to be fair and impartial.

I think had there been something such as that, but nothing was so, the bottom line is she repeated and said she can be a good juror and fair and impartial.

* * *

The Court: Before the Court makes a decision, let's do this. Let's question [Juror #2] a little bit further on the Facebook issue and see if we can make a determination one way or the other as to whether or not she is friends with somebody in the defendant's family or on Facebook. Do you want me to ask her questions or –

[The State]: That's fine.

[Defense Counsel]: Well.

The Court: Would you like to ask her?

[Defense Counsel]: No. I'd rather not ask her. Maybe [the prosecutor] should ask her, if that's all right with you. Inquiring further about an issue the [the State] has brought up.

[The State]: I mean, here's my problem at this point, and I am now being where I have to ask someone additional questions, knowing that I have asked for them to be removed, when I have provided the Court with race neutral reasons why, and now inquire more about that and only to potentially be told that I can't remove her; and I don't want to annoy her more at this point that I already have.

The Court: Okay. I'll ask her the questions then, but my reasoning is if she is friends with somebody from the defendant's family on Facebook then that may very well be a challenge for cause and even though I don't think it's particularly relevant, with respect to the peremptory challenge because the State is saying that it's concern is that she may very well be friends with someone in the defendant's family and if that's a concern of the

State's, then that would be a legitimate race neutral reason for using a peremptory challenge.

But before I even have to get to that, I'd like to know one way or another whether or not she is friends with someone.

[The State]: That's fine. I just have been in this court before where after we sat it's come to the attention that a juror knows a defendant and it worries me they are Facebook friends. That's a legitimate concern that I have at this point, so that's where I'm coming from.

The Court: Did [Juror #2] say that a McConnell she was friends with passed away?

[The State]: Correct.

The Court: Was there some way we can find out if someone in the defendant's family recently passed away?

[Defense Counsel]: I know my client's father recently passed away.

The Court: All right. Well, first of all, under the law, I don't believe [the State] is required to give any race neutral reasons for his peremptory challenge unless or until the Court first finds there is a pattern on the part of the State of excusing African-American jurors.

I don't find there to be a pattern. So based on that I will overrule the objection.

Tr. 65-70.

{¶ 28} Initially, we note, and the State concedes, that the trial court partially misstated the applicable law with respect to a *Batson* challenge when it stated that it had

to first find that there was a pattern on the part of the State of excusing African-American jurors before the State was required to provide race neutral reasons for its peremptory challenge of a minority juror. However, only a judgment may be reversed. *See* App.R. 12. And if the judgment is correct, we must affirm it, even if one of the trial court's reasons for the judgment may be incorrect. *Haggerty v. Upchurch*, 2d Dist. Montgomery No. 25912, 2014-Ohio-3162, ¶ 6, citing *State ex rel. McGrath v. Ohio Adult Parole Auth.*, 100 Ohio St.3d 72, 2003-Ohio-5062, 796 N.E.2d 526, ¶ 8 ("Reviewing courts are not authorized to reverse a correct judgment on the basis that some or all of the lower court's reasons are erroneous."); *see also Baumgartner v. Duffey*, 121 Ohio St.3d 356, 2009-Ohio-1218, 904 N.E.2d 534, ¶ 4 ("[W]e will not reverse a correct judgment even if some or all of the lower court's rationale was erroneous."). Here, although the trial court partially misstated the applicable law, its ultimate decision overruling McConnell's *Batson* challenge was correct.

{¶ 29} As we have previously held, a defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his or her race. *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 48. Apparent racial discrimination may be evident from the record by questions, remarks or comments relating to a single peremptory strike. *State v. Jenkins*, 2017-Ohio-693, 85 N.E.2d 406, ¶ 27 (2d Dist.), citing *Greene,* 2d Dist. Montgomery No. 24307, 2011-Ohio-4541, ¶ 7-9. In addition, or in the absence of evident discrimination, a pattern of peremptory strikes against minorities can be sufficient to demonstrate prima facie racial discrimination. *Id.* In the instant case, the record indicates that McConnell failed to

establish any facts or relevant circumstances sufficient to raise an inference that the State utilized its peremptory challenge specifically to exclude Juror #2 on account of her race. Accordingly, the trial court correctly found that it was not obligated to proceed to the second stage of the *Batson* inquiry, which is to inquire of the State whether it has a race-neutral explanation for the peremptory challenge. *Id.* Nevertheless, once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. *Id.*, citing *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) and *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999).

{¶ 30} However, even if we assume that the trial court was obligated to proceed to the second prong of the *Batson* inquiry, we conclude that the record supports the State's race-neutral explanation for exercising a peremptory challenge against Juror #2. As previously discussed, the State provided the following race-neutral reasons for exercising a peremptory challenge against Juror #2: 1) she was a single homeowner and would have to take vacation time from her job in order to remain on the jury; 2) she stated that she been the victim of a violent crime in 1999 and was familiar with one of the detectives in McConnell's case and believed him to "be a good man"; and 3) she was Facebook friends with a person who was potentially McConnell's father. In our view, we find that the multiple reasons provided by the State for its peremptory challenge of Juror #2 were sufficiently race-neutral to overcome a *Batson* challenge. Accordingly, we cannot say that the trial court's decision to allow the State to exercise its peremptory challenge with respect to Juror #2 was clearly erroneous.

{¶ 31} McConnell's second assignment of error is overruled.

**{¶ 32}** McConnell's third assignment of error is as follows:

THE TRIAL COURT ERRED SENTENCING THE DEFENDANT TO CONSECUTIVE SENTENCES. THE COURT FAILED TO MAKE THE PROPORTIONALITY FINDING REQUIRED FOR THE IMPOSITION OF CONSECUTIVE SENTENCES UNDER R.C. 2929.14(C)(4).

**{¶ 33}** In his third assignment, McConnell contends that the trial court failed to make the requisite proportionality findings before imposing consecutive sentences pursuant to R.C. 2929.14(C)(4).

**{¶ 34}** In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law.

**{¶ 35}** As this Court has previously noted:

"The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in exercising its discretion, a trial court must consider the statutory policies that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12. *State v. Leopard*, 194 Ohio App.3d 500, 2011-Ohio-3864, 957 N.E.2d 55, ¶ 11 (2d Dist.), citing *State v. Mathis*, 109 Ohio

St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 38.

*State v. Armstrong*, 2d Dist. Champaign No. 2015-CA-31, 2016-Ohio-5263, ¶ 12.

**{¶ 36}** In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 37}** At McConnell's sentencing hearing on August 24, 2018, the trial court stated

the following:

> \* \* \* The Court finds that consecutive sentences are necessary to protect the public from future crime and to punish the defendant, *and are not disproportionate to the seriousness of the defendant's conduct and to the danger he poses to the public.*
>
> That his history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.[2]  And that these two offenses were committed as part of a course of conduct.
>
> The harm caused was so great or unusual that no single prison term adequately reflects the seriousness of his conduct.

(Emphasis added.) Sentencing Tr. 6-7.

**{¶ 38}** In light of the foregoing, it is apparent that the trial court made the requisite proportionality findings before imposing consecutive sentences pursuant to R.C. 2929.14(C)(4).  In fact, the record establishes that the trial court made all of the requisite findings pursuant to R.C. 2929.14(C)(4) before it imposed consecutive sentences upon McConnell.

**{¶ 39}** McConnell's third assignment of error is overruled.

**{¶ 40}** McConnell's fourth assignment of error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN CONVICTING APPELLANT BECAUSE THE STATE FAILED TO

---

[2] The trial court noted that McConnell had six prior misdemeanor convictions: domestic violence and resisting arrest in 2014, and criminal trespass, aggravated menacing, possession of drugs, and theft in 2016.

PRESENT SUFFICIENT EVIDENCE AND THE CONVICTION IS AGAINST

THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 41} In his fourth assignment, McConnell argues that his conviction for aggravated robbery was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 42} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 43} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69, citing *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 30. "A claim that a jury verdict is against the manifest weight of the evidence involves a different test [than the sufficiency of the evidence]. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " (Internal citations omitted.) *Id.* at ¶ 71, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 44} The credibility of the witnesses and the weight to be given to their testimony

are matters for the trier of fact to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 45} This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 46} With the foregoing standards in mind, we conclude that McConnell's aggravated robbery conviction was supported by legally sufficient evidence and was not against the manifest weight of the evidence. The aggravated robbery statute provides, in relevant part, that no person attempting or committing a theft offense shall "[h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" R.C. 2911.01(A)(1). "A deadly weapon" includes "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2911.01(D)(1) citing R.C. 2923.11(A).

{¶ 47} Here, McConnell argues that, because the store clerk did not testify at trial, the evidence adduced by the State was insufficient to find him guilty of aggravated

robbery beyond a reasonable doubt. McConnell's argument is unpersuasive.

{¶ 48} As previously discussed, the robbery was recorded by surveillance cameras located on the inside and the outside of the Lo-Cost gas station. The gas station's owner testified that not only were the cameras operational at the time the robbery occurred, but also that he immediately turned the footage over to the police as soon as they arrived. Detective Ron Jordan testified that he took the footage of the robbery and created an information packet for patrol officers to use in their own investigations. Detective Jordan testified that what stood out most for him in the video was the robbery suspect's abnormal right eye. Based upon his review of the surveillance footage, Detective Jordan identified McConnell in court as the individual in the recording who robbed the store clerk at gunpoint. Detective Jordan also identified McConnell as the individual getting into and out of the white Jeep that could be seen in the video from the camera located outside of the store.

{¶ 49} The State also presented the testimony of Officer Massie, the patrol officer who initiated the traffic stop of the white Jeep matching the description of the vehicle from the robbery. Officer Massie also observed that the Jeep was missing one hubcap and had license plates from the state of Georgia, which were expired. On the basis of the expired tags, Officer Massie initiated a traffic stop of the vehicle. Officer Massie testified that, when he walked up to the vehicle, he observed that the driver, McConnell, had an abnormal right eye identical to the robbery suspect from the surveillance photographs. Based upon his suspicion that he had stopped the vehicle and an individual involved in the robbery, Officer Massie removed everyone from the vehicle, and he searched McConnell. Thereafter, the interior of the vehicle was searched, and Officer Massie

located a .380 caliber semi-automatic handgun under the driver's seat.

{¶ 50} Furthermore, the State presented the testimony of Jimmarko Shepherd. Shepherd testified that he waited in the Jeep while McConnell went inside and robbed the store. Upon returning to the Jeep, McConnell simply told Shepherd to "drive." Shepherd testified that, as they drove away, he observed McConnell pull out a handgun and begin counting money. Shepherd also testified that McConnell was the individual depicted in the surveillance footage who robbed the store, and he identified McConnell in court. In light of the foregoing testimony, there was legally sufficient evidence to sustain McConnell's aggravated robbery conviction.

{¶ 51} McConnell's manifest-weight argument is equally unpersuasive. As set forth above, the record supports a finding that McConnell displayed or brandished a deadly weapon while committing a theft offense. The credibility of the witnesses and the weight to be given their testimony were matters for the jury to resolve. *State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. Here, the jury quite reasonably credited the extensive testimony provided by the State's witnesses, evaluated said evidence and all reasonable inferences as compared to the elements of aggravated robbery, and found McConnell guilty. The jury did not lose its way in choosing to believe the eyewitness testimony of Shepherd who identified McConnell as the individual who robbed the Lo-Cost gas station at gunpoint on January 20, 2018, along with the video evidence of the crime. Having reviewed the entire record, we cannot find that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice has occurred.

{¶ 52} McConnell's fourth assignment of error is overruled.

{¶ 53} McConnell's fifth and final assignment of error is as follows:

THE STATE OF OHIO COMMITTED REVERSIBLE [ERROR] WHEN IT DID NOT CALL THE CLERK AS A WITNESS, VIOLATING MR. MCCONNELL'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM.

{¶ 54} In his final assignment, McConnell contends that the State committed reversible error when it did not call the store clerk to testify at trial, thereby depriving him of his Sixth Amendment right to confront his accusers.

{¶ 55} "The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to be confronted with the witnesses against him." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83. "To establish a Confrontation Clause violation, the defendant must show that he was 'prohibited from engaging in otherwise appropriate cross-examination' and '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination.' " *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 64 (8th Dist.), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). A defendant cannot claim that he was denied the right to confront his accuser when he has had the opportunity to cross-examine his accuser at trial. *See State v. Wickline*, 50 Ohio St.3d 114,118, 552 N.E.2d 913 (1990).

{¶ 56} The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to present witnesses on his or her own behalf and to use the power of the court to compel the

attendance of those witnesses, if necessary. This right is a fundamental element of due process of law, and in plain terms is the right to present a defense. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *State v. Brown*, 64 Ohio St.3d 649, 597 N.E.2d 510 (1992).

**{¶ 57}** In the instant case, the State was not required to call the store clerk to testify at trial. Obviously, the State believed it could establish its case against McConnell without the clerk's testimony, and it did. If McConnell had wanted to call the clerk as a witness in order to ask him questions regarding the aggravated robbery, defense counsel could have subpoenaed him to testify at trial. The fact that the State declined to call the clerk to testify on this record did not violate McConnell's Sixth Amendment right to confront his accusers as the crime was captured on surveillance video.

**{¶ 58}** McConnell's fifth assignment of error is overruled.

**{¶ 59}** All of McConnell's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

John M. Lintz
Kiriakos G. Kordalis
Hon. Douglas M. Rastatter